**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MIRIAM HANZER | : | |
| | : | |
| Plaintiff, | : | |
| | : | C. A. No. 12-363-LPS-MPT |
| v. | : | |
| | : | |
| THE MENTOR NETWORK | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

<u>**REPORT AND RECOMMENDATION**</u>

**I.     INTRODUCTION**

**A.     Procedural Background**

Pro se plaintiff Miriam Hanzer ("plaintiff") filed a complaint for employment

discrimination under Title VII of the Civil Rights Act of 1964 on July 26, 2011,[1] alleging

Mentor Network ("defendant") engaged in discriminatory conduct resulting in termination

of employment, failure to promote, failure to stop harassment, and retaliation.[2]  She

alleges defendant discriminated against her because of her race, national origin, and

color.[3]  The case was transferred to the District of Delaware from the Eastern District of

Pennsylvania on March 3, 2012,[4] and a motion to strike specific allegations of the

complaint was subsequently filed by defendant on April 24, 2012.[5]   Respective

---

[1] D.I. 1.
[2] *Id.* at 2-3.
[3] *Id.* at 3.
[4] D.I. 11.
[5] D.I. 20.

supporting and opposing briefs were filed by defendant and plaintiff on April 24, 2012,[6]

and June 8, 2012.[7]  Defendant filed its brief in reply on June 18, 2012.[8]  Presently

before the court is defendant's motion to strike paragraphs II.E 2-4, 7-8, 11, 13, 15-18,

20-21, and 22 (partial) from plaintiff's complaint under Federal Rule of Civil Procedure

12(f).[9]

### B.    Legal Standard

Pursuant to Rule 12(f), on a party's motion, "[t]he court may strike from a

pleading . . . any redundant, immaterial, impertinent, or scandalous matter."[10]

"Immaterial matter is that which has no essential or important relationship to the claim

for relief or the defenses being pleaded."[11]  "Impertinent matter consists of statements

that do not pertain, and are not necessary, to the issues in question."[12]  Scandalous

matter has been defined as "that which improperly casts a derogatory light on someone,

most typically on a party to the action."[13]  Although motions to strike "serve to 'clean up

the pleadings, streamline litigation, and avoid unnecessary forays into immaterial

---

[6] D.I. 21.
[7] D.I. 27.
[8] D.I. 28.
[9] D.I. 20.
[10] Fed. R. Civ. P. 12(f).
[11] *Delaware Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279, 1291-1292 (D. Del. 1995).
[12] *Id.* at 1292.
[13] *Aoki v. Benihana, Inc.*, 839 F. Supp. 2d 759, 764 (D. Del. 2012) (quoting *Carone v. Whalen*, 121 F.R.D. 231, 233 (M.D. Pa. 1988)).

matters,'"[14] as a general matter, these motions are disfavored.[15] They "ordinarily are denied 'unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties.'"[16] Therefore, "even where the challenged material is redundant, immaterial, impertinent, or scandalous, a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party."[17] When ruling on a motion to strike, the court must construe all facts in favor of the nonmoving party,[18] and it "should not grant a motion to strike an allegation unless the allegation is clearly insufficient."[19]

C.    Positions of the Parties

Defendant contends the complaint is "replete with superfluous and prejudicial allegations regarding her employment with Mentor that are immaterial to her national origin discrimination and retaliation claims."[20] It argues the complaint "contains numerous immaterial allegations that, if allowed to remain in the Complaint, will significantly prejudice Defendant."[21] To show prejudice, defendant posits the following

---

[14] *Penn Mut. Life Ins. Co. v. Norma Espinosa 2007-1 Ins. Trust*, C.A. No. 09-300-LPS, 2011 U.S. Dist. LEXIS 17172, at *4 (D. Del. Feb. 22, 2011) (quoting *McInerney v. Mayer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002)).

[15] *O'Gara ex rel. Portnick v. Countrywide Home Loans, Inc.*, C.A. No. 08-113-JJF, 2010 U.S. Dist. LEXIS 77130, at *3 (D. Del. July 30, 2010) (citing *Seidel v. Lee*, 954 F. Supp. 810 (D. Del. 1996)).

[16] *Sun Microsystems, Inc. v. Versata Enters.*, 630 F. Supp. 2d 395, 402 (D. Del. 2009) (quoting *McInerney v. Moyer Lumber and Hardware, Inc.*, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002)).

[17] *Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F. Supp. 2d 353, 359 (D. Del. 2009) (internal quotations omitted).

[18] *Proctor & Gamble Co. v. Nabisco Brands, Inc.*, 697 F. Supp. 1360, 1362 (D. Del 1988) (citations omitted).

[19] *Aoki*, 839 F. Supp. 2d at 764 (internal quotations omitted).

[20] D.I. 21 at 4.

[21] *Id.* at 5.

3

regarding paragraphs II.E 2-4, 7-8, 11, 13, 15-18, 20-21, and 22 (partial):

(1) allegations at issue "tend to portray Mentor in a bad light and are thus prejudicial;"[22]

(2) the "immaterial allegations confuse the issues before the Court and waste judicial

time and resources;"[23] and (3) "allowing [plaintiff] to proceed with such statements in her

Complaint could potentially broaden discovery beyond the limited claims she purports to

assert . . . and cause the parties to litigate matters that are not at issue in this case."[24]

        In response, plaintiff counters by arguing "all of the Incidents that I Documented

will show what lead up to the Threats, Intimidation, the Harassment, Discrimination and

the Defamatory Pre Se statements made by the defendant managers and staff."[25]  She

insists the allegations demonstrate how "managers on repeated occasions tried to make

[her] resign [her] position utilizing discriminatory and unfair treatment" and tried to

"sabotage [her] with repeated interruption, confusion and inaccurate directions."[26]  In

addressing the alleged prejudice to defendant, plaintiff states "the defendant worry

about the damages THE TRUE [sic] can cause to their reputation but what about the

damages The WILLFUL, DELIBERATE, MALICIOUS AND OUTRAGEOUS CONDUCT

AND THE DEFAMATORY PER SE statements made up by MENTOR Managers . . . are

causing to me and my family."[27]  Plaintiff suggests the allegations establish how the

---

[22] *Id.* at 11.

[23] *Id.*

[24] *Id.*

[25] D.I. 27 at 1-2.  When citing directly to plaintiff's brief in opposition, the court will literally quote all language as it appears in plaintiff's filing.  Likewise, the same holds true for all language quoted directly from plaintiff's complaint (D.I. 1).

[26] *Id.* at 13.

[27] *Id.* at 12 (additional emphasis omitted).  Although the quoted language references "damages," plaintiff is responding to defendant's claim the averments "tend to portray Mentor in a bad light and are thus prejudicial."

relief sought "stems from the natural proximate consequences of Defendants wrongful actions."[28]

## II.    ANALYSIS

"When faced with allegations that could possibly serve to achieve a better understanding of plaintiff's claims or perform any useful purpose in promoting the just disposition of the litigation, courts generally deny such motions to strike."[29] "'A court should not grant a motion to strike an allegation unless the allegation is clearly insufficient.'"[30] Here, the allegations at issue relate to plaintiff's Title VII action claiming defendant discriminated against her race, color, and national origin.[31] Plaintiff argues the discrimination is manifested by termination of her employment, failure to promote, failure to stop harassment, and retaliation.[32] Defendant believes "Ms. Hanzer offers this Court with no explanation as to why the allegations contained in the challenged paragraphs are properly within the scope of her Title VII national original [sic] and race discrimination and harassment claims or her Title VII retaliation claim."[33] However, plaintiff insists the allegations at issue explain defendant's conduct, which eventually culminated in the events giving rise to the action presently before the court.[34]

Title VII provides, in relevant parts, that is shall be unlawful for an employer to

---

[28] D.I. 27 at 7.
[29] *Delaware Health Care, Inc.*, 893 F. Supp. at 1292.
[30] *Aoki*, 839 F. Supp 2d at 764 (quoting *Singleton v. Medearis*, C.A. No. 09-CV-1423, 2009 U.S. Dist. LEXIS 101187, at *2 (E.D. Pa. Oct. 28, 2009)).
[31] D.I. 1 at 3.
[32] *Id.* at 2-3.
[33] D.I. 28 at 3.
[34] D.I. 27 at 1-2. Incidents "show what lead up to the Threats, Intimidation, the Harassment, Discrimination and the Defamatory Pre Se statements made by the defendant managers and staff."

"fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[35] For a Title VII claim alleging discrimination, plaintiff must prove:

> (1) [she] is a member of a protected class; (2) [she] suffered from some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly-situated person not of the protected class is treated differently.[36]

With respect to the alleged "failure to stop harassment," the court considers harassment claims under the framework for hostile work environment.[37]  "The determination of whether the quantity and quality of racial harassment has created a hostile work environment is made on a case-by-case basis after considering the totality of the circumstances."[38]  To establish a Title VII claim premised on a hostile work environment, plaintiff must demonstrate:

> (1) [she] suffered intentional harassment because of [her] race; (2) the

---

[35] 42 U.S.C. § 2000e-2.

[36] *Cuffee v. Dover Wipes Co.*, 334 F. Supp. 2d 565, 577 (D. Del. 2004).

[37] *See Nieves v. Acme Mkts., Inc.*, 541 F. Supp. 2d 600, 606 (D. Del. 2008) (analyzing allegations of harassment under framework for hostile work environment claim, finding "not all workplace conduct that may be described as harassment rises to the level of a hostile work environment."); *see also Kunin v. Sears Roebuck and Co.*, 175 F.3d 289, 293 (3d Cir. 1999) (stating a plaintiff can demonstrate a violation of Title VII by proving the harassment at issue created a hostile or abusive work environment); *Mack v. Greenville Ret. Cmty., LLC*, No. 00-470-GMS, 2001 U.S. Dist. LEXIS 17427, at *10 (D. Del. Oct. 23, 2001) ("In order to fall within the purview of Title VII, the conduct in question must be severe or pervasive enough to create both an objectively hostile or abusive hostile work environment . . . and an environment the victim-employee subjectively perceives as abusive or hostile.").

[38] *McLean v. Communications Constr. Group, LLC*, 535 F. Supp. 2d 485, 489 (D. Del. 2008) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482-84 (3d Cir. 1990)).

harassment was severe or pervasive; (3) the harassment detrimentally affected plaintiff[]; (4) the harassment would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.[39]

Finally, with respect to retaliation, "a plaintiff claiming retaliation must first establish a prima facie case for retaliation under Title VII."[40]  In order to do so, plaintiff must demonstrate by a preponderance of the evidence:  (1) [she] engaged in protected activity; (2) the defendant took adverse employment action against [her]; and (3) a causal link exists between the protected activity and the adverse action.[41]

Keeping these elements in mind and construing all facts in favor of the nonmoving party,[42] the court will now examine the allegations at issue to determine which could "possibly serve to achieve a better understanding of plaintiff's claims or perform any useful purpose in promoting the just disposition of the litigation."[43]

## A.    Paragraphs 2, 3, and 4

Defendant moved to strike paragraphs II.E 2, 3, and 4 in their entirety.  The pertinent facts and analysis for these paragraphs are related, and will be considered together.  The paragraphs read as follows:

**Paragraph 2.**  On November 2009, I was asked to check the Personal Spending Records (PSR) from 4 of our clients in one of our housing units because the Assistances Program Manager (APM) Nancy Beil was unable to check the PSR book on the prior months.  I found numerous discrepancies in the PSR from three clients.  I informed the Program Manager (PM) Karen McGee about the discrepancies I founded.  PM then

---

[39] *McLean*, 535 F. Supp. 2d at 489-490.
[40] *Cuffee*, 334 F. Supp. 2d at 574.
[41] *Id.* at 575.
[42] *Proctor & Gamble Co. v. Nabisco Brands, Inc.*, 697 F. Supp. 1360, 1362 (D. Del 1988)(citations omitted).
[43] *Delaware Health Care, Inc.*, 893 F. Supp. at 1292.

wanted me to falsify documents to the PSR and that we put the missing money back into the clients accounts.  At that time I informed the PM that I was not going to falsify documents and put money out of my pocket to cover people that misappropriated money from our participant accounts. PM then stated that she would put the money back to cover her friend, at that time the PM stated she was going to terminated that staff that was involved in the incident because she took a lot more money than before. PM reported the incident to the Division of Developmental Disabilities Services (DDDS) but she only reported that the money was missing from one of the books.[44]

**Paragraph 3.**  PM replaced the money with store invoices (personal items was purchases for clients) and stated that she would purchases the money orders to be sent to Pharamerica as stated on the PSR book for July and Augsut 2009 to pay clients co-pays.  At that time she informed me that I need to sign off on the PSR, I informed the PM at that time that I refused to sign any illegal documentation because I did not want to get in any trouble with the law.  I informed the PM it was the APM responsibility to ensure that the House Manager doing her job and to ensure the PSR books are up to date at the end of each month.  After that incident without notice the PM informed me that I would have to sign off the PSR book every month.  With my good judgment I could not falsify documentation and sign off on those PSR books, but I agree to correct one PSR book and start to sign it after these months.  I notice something was not right after this incident so I ask to be put on a day time position when one come available.  I use the excuse that I wanted to be able to work overtime without have to look for a part time job.[45]

**Paragraph 4.**  I also have couple of incidents prior to the above, one of our clients had to report to his parole officer every two weeks, the APM always was complaining to me that I should be the one that take the client to court or to meet his parole officer and not her (APM) or other staff because I was the Case Manager.  I never refused to take the client to the parole office or to the court but I refused to falsify information to the parole officer or to the judge because most of the time they did not informed the parole officer when the client violate the rules and state that everything was ok, the PM and APM did not want the client to go back to jail because this client is the son of one of the Director of the DDDS and they always try to keep him happy, in order for the company to continue getting new clients even when the company was on probation and should not get new

---

[44] D.I. 1 at 4, ¶ 2.
[45] *Id.* at 4, ¶ 3.

clients, stated the PM.[46]

As defendant correctly points out, these particular allegations, although related to plaintiff's employment with Mentor, are "immaterial to her national origin discrimination and retaliation claims."[47]   The events alleged therein take place before December 2009, the time at which plaintiff first complains of actions by defendant in violation of Title VII.[48] Plaintiff does not attempt to connect these allegations to any racial or discriminatory motives, only referring to allegedly unlawful falsification of documents and unequal treatment of clients.[49]   The complaint admits as much, positing "Karen McGee (PM) started harassing me *in retaliation for objecting [to] illegal misconduct and violation of public policy.*"[50]   Plaintiff clearly alleges defendant's initial retaliation was a response to these objections, objections to actions not falling within the purview of Title VII.

After the initial retaliation according to plaintiff, "*then* the PM and APM started to making fun, jokes, and slander statement about my Spanish accent."[51].   She clearly portrays the actions giving rise to the Title VII claim as beginning in December 2009, and does not put forth facts creating any inference of discrimination in relation to defendant's alleged actions in these specific paragraphs.   Even when liberally

---

[46] *Id.* at 4-5, ¶ 4.

[47] D.I. 21 at 4.

[48] *See* D.I. 1 at 5, ¶ 5.   Plaintiff asserts in December 2009, "the PM and APM started to making fun, jokes and slander statement about my Spanish accent."   This is the first time the complaint refers to any racially motivated or discriminatory actions by defendant or its agents.

[49] *See Id.* at 4-5, ¶ 4.   Plaintiff does not allege unfair treatment due to race or national origin, rather she asserts "the PM and APM did not want the client to go back to jail because this client is the son of one of the Director of the DDDS and they always try to keep him happy."

[50] *Id.* at 5, ¶ 5 (emphasis added).

[51] *Id.* at 5, ¶ 5 (emphasis added).

construing the complaint in plaintiff's favor,[52] the court cannot deduce any relation

between plaintiff's allegations and her Title VII claims.  The facts asserted within do not

"serve to achieve a better understanding of plaintiff's claims or perform any useful

purpose in promoting the just disposition of the litigation."[53]  These allegations "have no

possible relation to the controversy,"[54] therefore the court recommends paragraphs 2, 3,

and 4 be stricken in their entirety.

### B.    Paragraphs 7, 8, and 11

Defendant also moved to strike paragraphs II.E 7, 8, and 11 from the complaint.

Again, the pertinent facts and analysis for these paragraphs are related, and will be

considered together.  The paragraphs read as follows:

> **Paragraph 7**.  On 1/25/2010 around 8:30am, I informed the APM that I
> applied for a part time job with other agency for work when I'm off and on
> weekends.  APM stated that it will be to much work but I stated that I did
> not work on weekends and I'm not in on-call rotation.  On the same day
> around 10:00am the PM called me and informed me that it will be an
> emergency meeting that day at the office with all the House Manager.
> The PM also accuse me and then asked me why I was given overtime to
> the staff under my supervision, PM stated that the prior week I gave
> overtime to the staff when I send the staff to take some offices and
> cleaning supplies to one of the houses and told the staff to clean the
> bathroom because it was very dirty as I was told by other staff.  I told PM
> that I never gave overtime to the staff, when the staff worked over time the
> APM gave the permission to the staff, so the staff could cover open shift to
> one of the houses.  I also informed the PM the prior week I gave the staff
> two day off, one day because she with not have anything to do because it
> was a holiday and one because the staff has personal business to take

---

[52] *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (stating "a document filed pro
se is 'to be liberally construed' and 'a pro se complaint, however inartfully pleaded, will
be held to less stringent standards than formal pleadings drafted by lawyers'") (internal
citations omitted) (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)).

[53] *Delaware Health Care, Inc.*, 893 F. Supp. at 1292.

[54] *McInerney v. Moyer Lumber and Hardware, Inc.*, 244 F. Supp. 2d 393, 402
(E.D. Pa. 2002).

care of, so even with the holiday the staff would be under her 40 hours. PM then told me that if a bathroom needs to be clean from now on I with have to clean it myself or ask the staff that works in the house to clean it but on 01/20/2010 the PM and APM stated during a meeting to not give directions or give assignments to the staff on duty at the houses because it can create a conflict.  Housekeeping duties was not describe in my job functions.[55]

**Paragraph 8**.  During the meeting on 1/25/2010 I informed the program manager of a situation on one of our housing units, during a House Manager meeting, at that time I stated that we need to have two staff at the house during the overnight shift because of the fire drills and a safety issue, I stated that one staff is unable to take all the ladies out of the house within the two minutes time frame during the fire drill, the fire drills was taken more than 10 minutes to complete.  My main concern was the safety of the Clients and staff; they could not make it to the meeting point with the allotted time because two autistic individuals needed to be escorted by hand as they would not respond to the fire drill; the other individual will not get up from the bed, staffs had to pick her up and put her in the wheelchair, none of these three individuals can be left alone; and I also stated that we would have a big problem in case of a real emergency happen.  At that time the PM stated that she wasn't going hire a second staff for the overnight shift and stated that the staff will need to practice more fire drills.  Also during this meeting PM change my job duties again and informed me that I was going to be on call every two weeks.  After the meeting I reminded the PM that when the Case Manager position was offer to me on November 2007, She the PM told me in order for me take the position that I will not have to work on weekends, I can make up my own schedule every week, I can take classes on Friday mornings and the most important I was not going to be on-call, except when she the PM has to be out of the State, or on vacations.  At that time asked the PM why she did not meet with me first if she was going to change my job functions and schedule, Why always in front of my Co-worker with loud and threaten voice.  PM stated that she did not need to do it.  I told PM that I applied for a job for work on weekends, because before this incident I was off on the weekends and why she did not give me prior notice of these changes, she just look at me.**[56]**

**Paragraph 11**.  During this meeting Elizabeth Donovan informed me that I have to make the Progress Note from January for all the participants, she also stated that I need to speak with each staff about our clients and teach

---

[55] D.I. 1 at 5-6, ¶ 7.
[56] *Id.* at 6, ¶ 8.

the staff to do a better job documenting the clients information. I looked at the PM and stated to her during the meeting on 1/25/2010 when the PM order me to start doing the Progress Note I asked her in front of everyone present in the meeting if I had to start with January or February and the PM stated only February, now she want to go back a whole month back to start reading T-log. Elizabeth Donavan stated than we change our mind because the House Manager are not doing a good job and you have to do it. I stated to the PM that I have a case log of around 24 participant that it can take probably around 4 hour the first month to do the Progress Note for each participant in the way the Elizabeth Donovan is requesting but PM only look at me and stated that I needed to have January and February Progress Notes ready by March 5th and that I also have to do my regular job. There was no way that it can be done working 40 hours a week. During this meeting Elizabeth Donavan also asked me if I have my schedule for the following week ready. I stated yes then Elizabeth Donovan stated than like to see it. I went to my car and got my agenda, the PM made a copy the PM and Elizabeth Donovan stated that they will figure out how I can keep doing my regular job and the extra work, the PM also stated Elizabeth Donovan will do 4 or 5 Progress notes, the PM keep saying that Elizabeth Donovan will help me but she never help out.[57]

Although the alleged events alone do not meet the elements required for a Title VII claim, "workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances."[58] The "determination of whether the quantity and quality of racial harassment has created a hostile work environment is made on a case-by-case basis after considering the totality of the circumstances."[59] In making such determinations, the court has considers the frequency of the conduct at issue; the severity of the harassment; whether the conduct is physically humiliating; and whether it unreasonably interferes with an employee's work performance.[60]

---

[57] *Id.* at 8, ¶ 11.

[58] *Nieves*, 541 F. Supp. 2d at 606.

[59] *McLean*, 535 F. Supp. 2d at 489 (citing *Andrews v. City of Philadelphia*, 895 F. 2d 1469, 1482-84 (3d Cir. 1990)).

[60] *Nieves*, 541 F. Supp. 2d at 606.

Paragraphs 7 and 8 describe events occurring in January 2010, shortly after the alleged discriminatory harassment began.[61]  In these paragraphs, plaintiff refers to confrontations with managers in which she faced accusations she felt were unwarranted regarding allotment of staff overtime,[62] and she was humiliated when told "if a bathroom needs to be clean from now on [she would] have to clean it [her]self,"[63] despite the fact housekeeping duties were not part of her job description.[64]  On the same day, plaintiff alleges the PM made other significant changes to her duties without notice, such as forcing her to be on call every two weekends.[65]  Plaintiff took special exception to this new responsibility, insisting she had been promised work-free weekends as a condition of her hire in 2008,[66] an important condition given her personal scheduling constraints. Furthermore, plaintiff reports being ignored when she attempted to ask the PM about her new duties and why the PM would embarrass her in front of co-workers by addressing her in a loud and threatening voice.[67]  Paragraph 11 relates to the meeting referenced in paragraphs 7 and 8, and serves as an additional example of how plaintiff felt defendant's employees harbored a personal vendetta against her.  Here, plaintiff again references promises which were broken without notice,[68] thereby putting her at a

---

[61] *See* D.I. 1 at 5, ¶ 5.  Plaintiff claims discrimination began in December 2009, when defendant's managers criticized her accent.

[62] *Id.* at 5-6, ¶ 7.

[63] *Id.*

[64] *Id.*

[65] *Id.* at 6, ¶ 8.

[66] *Id.*  Plaintiff states "she the PM told me in order for me take the position that I will not have to work on weekends . . . and the most important I was not going to be on-call, except when she the PM has to be out of the State, or on vacations."

[67] *Id.* at 6, ¶ 8.

[68] *Id.* at 8, ¶ 11.

distinct disadvantage as she attempted to successfully complete her duties.

"Looking at all the circumstances,"[69] the allegations found within paragraphs 7, 8, and 11 "serve to achieve a better understanding of plaintiff's claims."[70]  These allegations shed light on:  the temporal proximity between the alleged initial discrimination and the events at issue; the potentially humiliating consequences of defendant's conduct; and the hindrances to plaintiff's work performance.  As a result, defendant does not meet the high standard required to strike the allegations, and paragraphs 7, 8, and 11 should remain in their entirety.

   C.     **Paragraphs 13, 15, 16, 17, and 18**

Defendant also moved to strike paragraphs II.E 13, 15, 16, 17, and 18.  These paragraphs too will be considered together as the analysis of the facts found within is related.  The paragraphs read as follows:

> **Paragraph 13**.  On 2/15/2010 My husband purchased a new laptop to help me speed up the task, my personal mouses work so fast with the new laptop that cut and paste was very hard so I went and purchases a regular mouse and some office supplies that I needed to keep up with my new task and keep everything organizes for 2/28/2010.[71]

> **Paragraph 15**.  On 3/2/2010 I asked the Program Manager for comp days for all the extra hours that I was force to work in order to have the Progress Note Ready.  I keep track of the time I was working at home so I showed my record to the PM.  The PM stated than she did not know that I was working at home because she (PM) can't see m working and that she did not authorizes me to work at home.  I told the PM to check Therap, a computer system that is set up to document the times you enter, read the notes and exit the system.  I also stated to PM that I had to purchased a new laptop to help speed up the task she gave me, my personal mouses work so fast with the new laptop so I went and purchased a regular mouse

---

[69] *Nieves*, 541 F. Supp. 2d at 606.
[70] *Delaware Health Care, Inc.*, 893 F. Supp. at 1292.
[71] D.I. 1 at 9, ¶ 13.

and office supplies that I need to keep out with my new task and keep everything organizes.  PM just keep saying that she will not give me comp time because she was not at my home to see that I was working.[72]

**Paragraph 16**.  On 3/3/2010 the PM asked me where was the mouse that I purchased with the P-Card I told the PM that it was at my house; she stated then that I cannot buy something with the P-Card for my personal uses I told the PM that I did not purchases the mouse for my personal uses, I stated that I bought the mouse to be able to cut and paste better because my mousses were to fast.  I stated to the PM that I have 4 mousses in my house for my own personal use, and the personal laptop that I was using for work even before I was promoted to Case Manager was not functioning correctly and I was force to purchase a new one in order to be able to complete the new job assignment.  The program manager then asked me to bring everything I had in my house to the office.  I did as I was told, I was very hurt and offended, because of the time and work I put into this new job.  I did my best for the company.  I went to my house I was crying a lot I call the office in New Jersey, I ask to speak Valery Bailey but she was not available, I was crying so much that my husband has to take the phone from me and spoke with the person on the phone, he was told that Valery was not available but that she will return the phone call but Valery never did it.  I put everything into boxes and placed them in front of the office that same day was assigned to me and I gave the PM the mouse and the usb storage device that I purchased to store all the clients documents.  At that time I showed the program manager the 4 mousses that I use for personal use, so she can see that I did not need to uses the company card for my personal uses.[73]

**Paragraph 17**.  I called the HR department on March 03, 2010, talked with Christine, she stated that the program manager did not authorize me to work in my home.  The statement the PM made are false PM did authorized me to work in home first went I was offer the position of Case Manager because I was not going to have a office the PM stated that I can do the paper work from my house, also I have an e-mail from the PM 11/12/2009 where she stated that I can take a day to work from my home or from the office from a working computer because my computer was having problems, at that time and she want to me be able to completed documentation of my visits; Christine HR also informed me that the PM did not authorized me to purchase a mouse or ink to print my work.  I told Christine HR that the PM told me long ago that I did not have to tell her every time I need something to do my job and that I can purchases ink or

---

[72] *Id.* at 9-10, ¶ 15.
[73] *Id.* at 10, ¶ 16.

work supplies with my P-Card.  Christine then stated that I have everything I need on my office to do my job.  I told Christine that I just was given a office early that day and I was told that I can uses the PM old computer that was gave to the secretary so I will have to share the computer with the secretary.  I told Christine that every body know that the company did not give me a computer and that everybody (Stated Workers, Day Program, Parents and even the PM and APM) was communicating with me from my personals computer for e-mails because I was not able to check my work e-mail regularly because I did not have a personal computer.  Christine just told me that can not be possible, that I should of had a computer at work.  I told Christine that I can prove that I been using my personal computers and printers all these years, I have the documentations, but she only stated that she just didn't believe it.[74]

**Paragraph 18.**  Then Christine told me that the company did not recognizes comp time and I told Christine that here in Delaware we was using it and that every body that was salary was using comp time but one against she did not believe me, even when I said I have prove that the statement made by the PM were false and than Christine told me to finish the assignment I was doing and to leave and go home.  I was in the parking lot in front of one of our housing unit.  I was crying when the House Manager came to me and ask me what happen, then we went into the house and spoke with QA Rachel from New Jersey, she was working at that time.  I explained my situation to her, yes I was crying because I could not believe that after all the work I did for this company that the program Manager would give false statement about me I was very offend and in mental anguish.  I showed that QA Rachel my paper track of some of the irregularities and bad management of the company, she told me to speak with Valery.**[75]**

Again, the "determination of whether the quantity and quality of racial harassment

has created a hostile work environment is made on a case-by-case basis after

considering the totality of the circumstances."[76]  In paragraph 10, when speaking of

alleged harassment, plaintiff expresses feeling "very offended about the excessive

---

[74] *Id.* at 10-11, ¶ 17.
[75] *Id.* at 11, ¶ 18.
[76] *McLean*, 535 F. Supp. 2d at 489 (citing *Andrews v. City of Philadelphia*, 895 F. 2d 1469, 1482-84 (3d Cir. 1990)).

interrogations"[77] she was forced to endure.  The allegations in paragraphs 15, 16, 17, and 18 tell of further excessive interrogation which eventually culminated in plaintiff breaking down and crying.[78]  Although not speaking directly to discriminatory conduct in paragraph 13, the allegations within lay the foundation for subsequent paragraphs in which plaintiff complains of continuing harassment through interrogation and unreasonable demands.

Construing the allegations in a light most favorable to plaintiff, these paragraphs "serve to achieve a better understanding of plaintiff's claims"[79] as they provide greater insight as to the frequency of the conduct at issue and whether it unreasonably interfered with plaintiff's work performance.[80]  Paragraphs 13, 15, 16, 17, and 18 serve as additional links in the chain of conduct directed at plaintiff immediately following the December 2009 incident in which she alleges discriminatory conduct began.  These actions are clearly relevant under the totality of the circumstances, and, therefore, the court recommends paragraphs 13, 15, 16, 17, and 18 not be stricken.

### D.    Paragraph 20, 21, and 22 (partial)

Defendant also moved to strike paragraphs II.E 20, 21, and portions of 22. These paragraphs will be considered together as the analysis of the facts found within is related.  The paragraphs read as follows:

> **Paragraph 20**.  When I meet with Valery B., she stated that she can get me fire because I was furious when I was talking to New Jersey QA.  I told Valery that I was not furious but that I was very upset, offended, and in

---

[77] D.I. 1 at 7, ¶ 10.
[78] *Id.* at 10-11, ¶¶ 16, 18.
[79] *Delaware Health Care, Inc.*, 893 F. Supp. at 1292.
[80] *Nieves*, 541 F. Supp. 2d at 606.

mental anguish and crying, but that I did not disrespect any one or used
profanity words as other people.  This is something she should know
because Veronica Box received a complaint from one staff that stated that
the APM yelled and uses profanity word toward her in front of PM, staff
and clients.[81]

**Paragraph 21**.  Then Valery said that if the PM did not authorize me to
work at home I should not done it.  She also stated that the PM only told
me to bring the stuff that I had at home back to the office because it
needed to be were it belong.  I stated to Valery at that time that we moved
into the new office on Monday, and I was placed in a office room the day
before she arrived on 03/03/2010.  PM Karen McGee gave me her old
desk and her desktop computer that we all had to share with the
secretary, PM only gave me a computer only because of the incident.[82]

**Paragraph 22**.  Valery then asked me for my driving record and I gave it
to her.  She stated that they have to fax it to the State because they can't
have a CM driving with no pin number.  I told Valery that I told Karen that I
had 6 points on my driving record because I wanted to see what she was
going to do.  First I drive my own car I did not need a pin number with
Mentor although I still have my pin because I been never been notify that
my pin has been suspended.  I also told Valery that I personally spoke
with Pat W. the person in charge of the State Vehicles and explain my
situation because I applied for a par time job that will require another pin
and since I was going to lose two point at the end of February, she told me
to take a driving safety class and sent the prove to her.

I also informed Valery that the PM manager allow two people to drive the
Stated Vehicle without pin and without driver licenses because their driver
licenses that were suspended, and right now she have a person working
even alone in the houses with many suspensions and have so many
points that will never be allow to get a pin as per APM statement and that
person even transports clients.  I also told Valery that the PM and APM
have people working even when they know they uses the Flee vehicles for
personal business and one was reported to be driving over 80 miles an
hour.[83]

These paragraphs again "serve to achieve a better understanding of plaintiff's

---

[81] D.I. 1 at 12, ¶ 20.
[82] *Id.* at 12, ¶ 21.
[83] *Id.* at 12-13, ¶ 22.

claims"[84] when "looking at all the circumstances,"[85] therefore they should not be

stricken.  Large portions of plaintiff's complaint revolve around feeling "very stupid,

uncomfortable and offended"[86] in response to actions directed at her by defendant's

employees.  These actions range from interrogation to public scolding to jokes directed

at plaintiff's ethnicity.  Additional evidence of actions causing plaintiff to feel these

emotions can be found within paragraphs 20, 21, and 22, as plaintiff alleges being

subjected to unwarranted threats of firing,[87] not receiving the same treatment as her

peers,[88] and again being forced to endure extensive questioning.[89]  Therefore, these

allegations contribute to the circumstances leading to plaintiff's Title VII claim, and it

cannot be said they "'have no possible relation to the controversy.'"[90]  As a result, the

court recommends these paragraphs not be stricken.

## III.    ORDER AND RECOMMENDED DISPOSITION

For the reasons contained herein, this Court recommends:

(1) As to paragraphs II.E 2-4, defendant Mentor Network's motion to strike

pursuant to FED. R. CIV. P. 12(f) (D.I. 20) is GRANTED.

---

[84] *Delaware Health Care, Inc.*, 893 F. Supp. at 1292.
[85] *Nieves*, 541 F. Supp. 2d at 606.
[86] D.I. 1 at 13, ¶ 25.
[87] *Id.* at 12, ¶ 20.
[88] *Id.* at 12-13, ¶ 22.  Plaintiff was told "[defendant] can't have [plaintiff] driving with no pin number", however plaintiff asserts "the PM manager allow two people to drive the Stated Vehicle without pin."  Additionally, plaintiff was denied personal use of the vehicle, despite fact "the PM and APM have people working even when they know they uses the Flee vehicles for personal business."
[89] *Id.* at 12, ¶¶ 20-22.
[90] *Sun Microsystems, Inc. v. Versata Enters.*, 630 F. Supp. 2d 395, 402 (D. Del. 2009) (quoting *McInerney v. Moyer Lumber and Hardware, Inc.*, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002)).

(2) As to paragraphs II.E 7-8, 11, 13, 15-18, 20-21, and 22 (partial), defendant

Mentor Network's motion to strike pursuant to FED. R. CIV. P. 12(f) (D.I. 20) is DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),

FED. R. CIV. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific

written objections within fourteen days after being served with a copy of this Report and

Recommendation.[91]  The objections and response to the objections are limited to ten

pages each.

The parties are directed to the Court's Standing Order in Pro Se matters for

Objections Filed under FED. R. CIV. P. 72, dated November 16, 2009, a copy of which is

available on the Court's website, www.ded.uscourts.gov.


Date: July 30, 2012                    _____/s/ Mary Pat Thynge_____
                                        UNITED STATES MAGISTRATE JUDGE

---

[91] FED. R. CIV. P. 72(b)(2).