## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MIRIAM HANZER,                          :
                                        :
            Plaintiff,                  :        Case No. 12-363-LPS-MPT
                                        :
    v.                                  :
                                        :
NATIONAL MENTOR HEALTHCARE,             :
LLC d/b/a DELAWARE MENTOR               :
                                        :
            Defendant.                  :
                                        :

## OPENING BRIEF IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Date: October 31,  2013
        Wilmington, DE

Jami Nimeroff (DE # 4049)
Brown Stone Nimeroff LLC
901 N. Market Street, Suite 1300
Wilmington, DE  19801
(302) 428-8142 (t)
(302) 351-2744
jnimeroff@bsnlawyers.com

and

Barbara Rittinger Rigo, Esq. (PA #76630)
(*admitted pro hac vice*)
Leigh Ann Bigley, Esq. (PA #311228)
(*admitted pro hac vice*)
Littler Mendelson, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102
267.402.3000 (t)
267.402.3131 (f)
brigo@littler.com
labigley@littler.com

Attorneys for Defendant
National Mentor Healthcare, LLC d/b/a Delaware
Mentor

# TABLE OF CONTENTS

PAGE

I.      NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II.     SUMMARY OF ARGUMENT ....................................................................................... 1

III.    FACTUAL BACKGROUND ........................................................................................... 2

        A.      Plaintiff's Employment with DE Mentor.............................................................. 2

        B.      Hanzer Was Made Aware of Discrepancies with Clients' PSRs in
                November 2009....................................................................................................... 3

        C.      DE Mentor is Placed on Probation in December 2009 .......................................... 6

        D.      Hanzer and a House Manager Complain About Each Other in January
                2010........................................................................................................................ 8

        E.      Hanzer's Position is Eliminated in March 2010 by Bailey.................................. 10

IV.     LEGAL ARGUMENT .................................................................................................. 12

        A.      Standard Of Review ............................................................................................. 12

        B.      DE Mentor Did Not Discriminate Against Hanzer.............................................. 13

                1.      Hanzer Fails to Prove a Prima Facie Case of Discrimination
                        Because Her Termination Was Not Under Circumstances Which
                        Give Rise to an Inference of Unlawful Discrimination .......................... 14

                2.      Hanzer was Terminated for the Non-Discriminatory Reason that
                        Her Performance Was Lacking and DE Mentor Wanted to
                        Eliminate the Case Manager Position and Replace It With a
                        Program Support Coordinator Position.................................................... 16

                3.      Hanzer Cannot Discredit DE Mentor's Non-Discriminatory
                        Reasons for Terminating Her Employment Or Produce Evidence to
                        Show Her Termination was Discriminatory ............................................ 17

        C.      Hanzer Cannot Establish Any Discrimination, Much Less Severe or
                Pervasive Discrimination as Required for Her Hostile Work Environment
                Claim..................................................................................................................... 19

        D.      Hanzer's Retaliation Claim Fails Because She Did Not Engage In Any
                Activity Protected by Title VII ............................................................................ 21

# TABLE OF CONTENTS
### (CONTINUED)

**PAGE**

E.  DE Mentor Did Not Violate the Whistleblowers' Protection Act ...................... 22

  1.  Plaintiff's WPA Claim Fails Because She Does Not Identify a Law That Was Violated and Does Not Allege That She Was Asked To Commit Any Violation ......................................................................... 22

  2.  Plaintiff's WPA Retaliation Claim Fails Because She Cannot Show That It Was The Primary Basis for Her Termination .............................. 24

V.  CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Cuffee v. Dover Wipes Co.*,
    344 F. Supp. 2d 565 (D. Del. 2004) ........................................................................................21

*Fuentes v. Perksie*,
    32 F.3d 759 (3d Cir. 1994) ...........................................................................................13, 18

*Jacques-Scott v. Sears Holding Corp.*,
    2013 U.S. Dist. LEXIS 83157 (D. Del., June 13, 2013) ......................................12, 15, 16, 20

*Jones v. School Dist. of Philadelphia*,
    198 F.3d 403 (3d Cir. 1999) .........................................................................................14, 25

*Jordan v Town of Milton*,
    2013 U.S. Dist. LEXIS 739 (D. Del. Jan. 3, 2013) ................................................................24

*Keller v. Orix Credit Alliance, Inc.*,
    130 F.3d 1101 (3d Cir. 1997) ..................................................................................13, 17, 18

*McDonnell Douglas v. Green.*
    411 U.S. 792 (1973) .........................................................................................................13

*McLean v. Communications Constr. Group*,
    535 F. Supp. 2d 485 (D. Del. 2008) .....................................................................................20

*Peace-Wickham v. Walls*,
    2009 U.S. Dist. LEXIS 109215 (D. Del. Nov. 23, 2009) ...................................................19, 20

*Solomon v. Soc'y Of Auto. Engineers*,
    41 Fed. Appx. 585 (3d Cir. 2002) ........................................................................................14

*Subh v. Wal-Mart Stores*,
    E., LP, 2009 U.S. Dist. LEXIS 26810 (D. Del., Mar. 31, 2009) ................................15, 19, 20

*Sullivan v. Nationwide Life Ins. Co. of Am.*,
    720 F. Supp. 2d. 483 (D. Del. 2010) .........................................................................15, 19, 20

*Verma v. Univ. of Pa.*,
    2013 U.S. App. LEXIS 16342 (3d Cir. Aug. 7, 2013) ............................................................21

# TABLE OF AUTHORITIES
### (CONTINUED)

**PAGE**

### STATUTES

19 Del. C. § 1702(6) ................................................................................................22

19 Del. C. § 1708 ....................................................................................................24

title 19, section 1703 of the Delaware Code ...............................................................22

### OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) ...............................................................................................12

Rule 56 of the Federal Rules of Civil Procedure ..........................................................1

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Miriam Hanzer ("Hanzer") was employed by the National Mentor Healthcare

LLC d/b/a Delaware Mentor ("DE Mentor") until March 2010, when her position was eliminated

and her employment was terminated.  In the Complaint, Hanzer alleges discrimination, hostile

work environment, and retaliation in violation of Title VII based on her color, race, and national

origin.  Additionally, Hanzer claims violations of the Delaware Whistleblowers' Protection Act.

DE Mentor now moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil

Procedure, because there are no genuine issues of material fact and DE Mentor is entitled to

judgment as a matter of law.

## II.     SUMMARY OF ARGUMENT

1.      Hanzer is unable to establish a *prima facie* case of race, color, or national origin

discrimination because she cannot demonstrate any inference of discrimination related to her

termination.  Even if she could establish a *prima facie* case of discrimination, she cannot rebut

DE Mentor's legitimate, non-discriminatory reason for her termination.

2.      Hanzer's claim for hostile work environment fails because she cannot establish

severe or pervasive discrimination based on—at most—an isolated comment made by a co-

worker and legitimate changes to business processes that impacted all employees.

3.      Hanzer's claim for retaliation fails because she cannot show that she engaged in a

protected activity.  The sole basis for her retaliation claim is a complaint she made about a co-

worker, which is wholly unrelated to her race, color, national origin, discrimination, harassment,

or any other act protected by Title VII.

4.      Hanzer is unable to establish a violation of the Whistleblowers' Protection Act

because she fails to present evidence of a violation, much less evidence that she was asked to

commit a violation or that her alleged refusal to commit a violation was the primary basis for her

termination.  As such, she can also not prove retaliation under the statute.

## III.    FACTUAL BACKGROUND

### A.    Plaintiff's Employment with DE Mentor

DE Mentor, which is a part of the Mentor Network, provides residential and day services to adults with developmental disabilities.  (Ex. G, pp. 9-10, APP0228-0229.)  There are seven DE Mentor facilities, the majority of which are located in Sussex County.  (Ex. G, pp. 13-14, APP0230-0231; Ex. E, pp. 78-79, APP0035-0036.)  Each facility is staffed with a number of direct care professionals who take care of the "clients" (as the residents are referred to) and their daily needs (e.g., doctor appointments, food, medication, etc.).  (Ex. E, pp. 34, 40, 79, APP0020, 0023, 0036.)  The direct care professionals report to the House Manager assigned to the facility; House Managers report to the Assistant Program Manager.  (Ex. G, pp. 19-20, APP0232-0233.)

Hanzer's employment with DE Mentor began in June 2006 as a direct care professional at the Falcon Crest facility.  (Ex. E, pp. 33, 38, 41, APP0019, 0021, 0024.)  In September 2006, Hanzer was promoted to House Manager of the Millsboro House.  (Ex. E, pp. 38-40, APP0021-0023.)  In her role as House Manager, Hanzer oversaw the facility, the three clients who lived there, and a staff of five direct care professionals.  (*Id*.)

In November 2007, Karen McGee ("McGee"), who was the Program Manager for DE Mentor, promoted Hanzer to the new position of Case Manager (reporting directly to McGee).  (Ex. G, p. 9, APP0228; Ex. E, pp. 58-59, 68-69, 75, 88, 266, APP0027-0030, 0032, 0039, 0115.)  Hanzer was the only DE Mentor Case Manager and was responsible for all seven facilities.  (Ex. E, pp. 78-79, APP0035-0036.)  Nancy Beil ("Beil"), the Assistant Program Manager, also reported to McGee.[1]  (Ex. E, pp. 83-84, APP0037-38.)

---

[1] Beil is currently employed by DE Mentor as the Regional Operations Director.  (Ex. E, p. 130, APP0063; Ex. I, p. 4, APP0318.)

Hanzer's main responsibility as Case Manager was creating and maintaining the Essential Lifestyle Plans ("ELPs").  (Ex. I, pp. 10, 13-14, APP0319-0321; Ex. G, p. 23, APP0235; Ex. E, p. 74-75, APP0031-0032; Ex. F, pp. 36-37, APP0204-05.)  An ELP is a written plan that spells out in detail how each client should be cared for and includes client-specific information on their vital needs.  (*Id.*; Ex. J, APP0366-0380.)  Hanzer was required to develop the content in the ELPs through interactions with clients, State case managers, House Managers, quality improvement individuals, the Assistant Program Manager (Beil), and the Program Manager (McGee).[2]  (Ex. G, p. 24, APP0236.)  Each ELP must be updated and reviewed yearly, per Medicaid regulations.  (Ex. E, pp. 546-47, APP0178-0179; Ex. I, pp. 94-95, 101-02, APP0351-0352, 0355-0356; Ex. H, pp. 29-30, APP0299-0300.)

Hanzer's country of national origin is Panama, her race is Hispanic, and her color is Mestizo (one black parent, one white parent).  (D.I. 40, ¶¶ 9-11.)  In 2008, around the time of her promotion to Case Manager, Hanzer took English as a Second Language ("ESL") classes.  (Ex. E, pp. 75-77, APP0032-0034.)  McGee knew Hanzer was taking these classes, knew Hanzer was Hispanic and Spanish-speaking, and always accommodated her class schedule.  (*Id.*)

**B.**    **Hanzer Was Made Aware of Discrepancies with Clients' PSRs in November 2009.**

Every DE Mentor client has a Personal Spending Record ("PSR") which documents money that is deposited into their account and money that is spent.  (Ex. G, pp. 29-30, APP0237-0238; Ex. I, pp. 107-09, APP0361-0363.)  The House Manager (or a designee) is responsible for the receipts and documentation of the account.[3]  (Ex. G, pp. 29-30, APP0237-0238.)   Hanzer

---

[2] Similar to the Case Manager position at DE Mentor, there is a corresponding case manager position for the State of Delaware whose duties are to oversee the ELPs for the State.  (Ex. I, pp. 75-76, APP0330-0331.)
[3] House Managers have access to client funds when, for example, they take a client to the bank to withdraw money. (Ex. G, p. 31, APP0239.)

and the State case manager oversaw the PSRs, which ultimately fell within McGee's purview. (Ex. G, pp. 29-35, APP0237-0243; Ex. E, pp. 566, 627, APP0180, 0190; Ex. I, p. 14, APP0321.)

In November 2009, Hanzer claims she was alerted to PSR discrepancies for three Falcon Crest clients by the State case manager.  (Ex. E, pp. 113-18. APP0046-0051, pp. 518-20, APP0169-0171; Ex. G, p. 41, APP0247; Ex. I, pp. 33-34, APP0314-0315.)  She reviewed the PSRs and discovered that there were several handwritten receipts for client purchases rather than store receipts.  (Ex. E, pp. 118-21, APP0051-0054.)  Hanzer believed these discrepancies were due to misconduct by the House Manager.  (Ex. E, pp. 115-16, APP0048-0049.)  When Hanzer told McGee about the handwritten receipts, McGee said "Well, we'll have to put the money back."  (Ex. E, p. 120-21, APP0053-0054)  For some reason, Hanzer leapt to the implausible conclusion that McGee meant that she, Beil, and McGee should use their personal funds to cover any discrepancy, rather than the company's funds.[4]  (*Id.*)  Hanzer testified that she told McGee she would not use her own funds to replace the missing money and that Beil—who is Caucasian and English speaking—also refused so McGee replaced it herself [5]  (Ex. E, pp. 121-23, 129-30, APP0054-0056, 0062-0063; Ex. M, ¶ 1, APP0440.)  Additionally, Hanzer claims that McGee asked her to sign the corrected PSRs and backdate her signature; Hanzer testified that she only signed for November, representing that the PSRs were correct.[6]  (Ex. E, pp. 135-41, APP0066-0072.)

Meanwhile, it is undisputed that McGee began investigating the discrepancies uncovered by the State by comparing receipts, bank statements, and PSRs.  (Ex. E, pp. 113-18, APP0046-

---

[4] McGee denies that she ever asked anyone to use their own funds to make any client account whole and that if client funds were missing the client was made whole by the Company.  (Ex. G, pp. 34, 37-38, 43-44, APP0245-0246, 0249-0250.)

[5] Beil also testified that she was never asked to contribute her personal funds but, for purposes of this Motion only, all allegations of Plaintiff will be taken as true.  (Ex. I, p. 41, APP0320.)

[6] This assertion is most likely incorrect as Hanzer signed the October PSR in November 2009 and it was not backdated.  (Ex. K, APP0400-0408.)

0051; Ex. G, pp. 35-36, APP0243-0244.)  Her documents from that time, however, only indicated discrepancies in one client PSR.  (Ex. A, APP0001-0005.)  McGee was responsible for performing the investigation—known as a PM46 —as she was certified by the State as a PM46 investigator.[7]  (Ex. I, pp. 37-38, APP0326-0327; Ex. G, pp. 55-56, APP0254-0255.)  McGee then reported her findings to the State coordinator who conducted an independent investigation in conjunction with her PM46 investigation.[8]  (Ex. E, p. 142-43, 156-57, APP0073-0074, 0086-0087; Ex. G, pp. 42-43, 53-56, APP0248-0249, 0252-0255; Ex. I, pp. 43-44, APP0329-0330.)  As a result of the investigation, McGee terminated the Falcon Crest House Manager who was responsible for the discrepancies and a police report was filed against her.  (Ex. A, APP0001-0005; Ex. E, 157, APP0087; Ex. G, pp. 44-45, APP0044-0045.)  A full account of this incident was reported to the State.  (Ex. A, APP0001-0005.)

When discrepancies with PSRs are found, DE Mentor is responsible for either replacing the items on the receipts or reimbursing the client's funds—*i.e.*, making the client whole.  (Ex. E, pp. 126-28, APP0059-0061; Ex. G, p. 34, APP0242.)  Accordingly, Plaintiff testified that McGee gave Beil and Hanzer money to go to Walmart to buy replacements for the personal care and household items that were on the handwritten receipts.  (Ex. E, pp. 125-26, APP0058-0059.)  Hanzer claims that all three PSR books were corrected:  Hanzer did one; McGee did one; and Beil did one.[9]  (Ex. E, pp. 141-42, APP0072-0073.)  Hanzer testified that November 2009 was

---

[7] Hanzer testified that PM46 investigations are not uncommon and there can be many during a year.  (Ex. E, pp. 585-86, APP0181-0182.)

[8] Although these discrepancies were reported to the State, not all PSR discrepancies are reportable offenses.  It is a common occurrence for receipts to be missing from the PSRs—not every missing receipt requires reporting.  (Ex. I, pp. 35-36, 105-06, APP0324-0325, 0359-0360.)

[9] Although Hanzer believes that only one PSR book was reported to the State based on her claim that the State case worker only referred to "one book" in their conversation, she does not offer evidence to substantiate her belief.  (Ex. E, pp. 142-43, 156, APP0073-0074, 0156.)  Instead, Hanzer's own testimony indicates that all three discrepancies with the books were known by the State, confusing her claim further.  Hanzer further testified that in February 2010, the State case manager asked Hanzer to follow-up on some money orders for PharMerica, the pharmacy the company used at the time.  (Ex. E, pp. 145-55, 623-24, APP0075-0085, 0188-0189.)  These PharMerica issues were

the first and only time that she discovered these types of discrepancies with the PSRs.  (Ex. E, pp. 159-60, APP0088-0089.)   Thus, it appears that Hanzer is claiming that three PSRs (not one) were incorrect, all were fixed, the person responsible was terminated, but only one incorrect PSR was reported to the State.  (Ex. E, pp. 115-16, 141-43, 156, APP0048-0049, 0072-0074, 0086.)  Despite this, she also claims that it was the State case manager who first discovered these issues, thus acknowledging that the State was already aware of any PSR issues.  (Ex. E, pp. 518-20, APP0169-0171.)  She also does not claim to have refused to fix the PSR, as long as she did not have to use her own money, and never reported the two other alleged PSR discrepancies to the State.

### C.      DE Mentor is Placed on Probation in December 2009.

On December 16, 2009, the Division of Developmental Disabilities Services ("DDDS") informed McGee that DE Mentor was being placed on probation due to systemic issues, including problems with ELPs and medication administration.  (Ex. B, APP0006; Ex. H, pp. 14-18, APP0285-289; Ex. F, pp. 42-47, 49-50, APP0210-0217; Ex. I., pp. 48-49, 101-02, APP0331-0332, 0355-0356.)  It was not related to any of the alleged November 2009 PSR incidents.  (Ex. F, pp. 50-51, APP0217-0218; Ex. I, pp. 101-02, APP0355-0356.)   Probationary status was significant, as it prohibited state referrals, resulting in an impact to long-term funding.  (Ex. E, pp. 90-91, APP0041-0042; Ex. F, pp. 36-37, APP0204-0205; Ex. M, ¶ 3, APP0430.)  Hanzer was aware that DE Mentor was placed on probation, understood the magnitude of that status, and

---

addressed after Hanzer's termination and she admits that they were separate from the missing receipts and she was unaware of their resolution.  (Ex. E, pp. 528-29, APP0172-0173.)  As such, she does not—and cannot—base any of her claims on these PharMerica receipts as Hanzer did not report them until after her termination.  (Ex. K, APP0409-0410, 0422-0423.)  It is undisputed, however, that at least one PSR was reported to the State by McGee regarding the missing receipts in November 2009 and that an additional, unrelated investigation was done in March 2010 regarding the PharMerica receipts.  *(Id.*; Ex. E, pp. 141-42, 623-24, APP0072-0072, 00188-0189; Ex. G, pp. 42-43, APP0248-0249.)  It is also undisputed that the House Manager responsible for any missing receipts alleged by Plaintiff was terminated and that all funds were returned to the patients in question in the November 2009 timeframe.  (Ex. E. pp. 124-27, 141-42, 157, APP0072-0073, 0087; Ex. G, pp. 44-45, APP0250-0251.)

agrees that probation was something that necessitated process changes.  (Ex. E, pp. 90-93, APP0041-0044.)

As a result of the probation, DE Mentor sought to build a stronger infrastructure by adding additional personnel, including Elizabeth Donaway in the Quality Assurance department[10].  (Ex. G, pp. 69-70, APP0256-0257; Ex. H, p. 14, APP0285.)  When Donaway was hired in January 2010, she began by auditing the facilities' ELPs—the primary area that needed improvement.  (Ex. H, pp. 3, 31-32, APP0284, 0301-0302.)  Donaway determined that the ELPs (prepared by Hanzer), were not in compliance and needed to be redone.  (Ex. H, pp. 32, 35-37, APP0302-02305.)  Based on her extensive experience, Donaway did not believe this was an unreasonable or difficult task to accomplish since there were only seven houses.  (Ex. H., pp. 41-42, APP0307-0308.)  During her audit, Donaway met with Hanzer several times to review in detail the things that needed to be corrected on the ELPs but she saw only minimal improvement.  (Ex. E, pp. 319-20, APP014-0144; Ex. H, pp. 47-52, APP0309-0314.)  The feedback Donaway provided to Hanzer was constructive in nature.  (Ex. N, APP0457-0464.)

Around this same time, Hanzer alleges that McGee and Beil began harassing her and mocking her accent.  (D.I. 40, ¶ 28; Ex. E, pp. 160-61, APP0089-0090.)  When pressed, however, Hanzer could only point to one instance in which Beil, her co-worker, allegedly mistook Hanzer's pronunciation of a "sheet" of paper, for "shit," and she and McGee laughed at this comment. [11]  (Ex. E, pp. 178-84, APP0098-0104.)  In December 2009, Hanzer also claims that McGee began calling her, telling her what to do for work, and then sometimes changing her mind.  (Ex. E, pp. 159-66, APP0088-0095.)  Additionally, Hanzer was asked to complete tasks

---

[10] Donaway was an expert in developmental disabilities and maintaining compliance with state regulations.  (Ex. H, pp. 22-28, APP0292-0298; Ex. I, pp. 53-54, APP0333-0334.)

[11] Beil and McGee deny ever mocking Hanzer's accent and both testified that they did not have any problem understanding her.  (Ex. I, pp. 95-97, 104-05, APP0352-0354, 0358-0359; Ex. G, pp. 106-07, APP0274-0275.)

that she did not believe were part of her job and was asked to come in early to review her paperwork before meetings with the State.[12]  (Ex. E, pp. 162, 166, APP0091, 0095.) Unsurprisingly, this alleged "harassment"—which really amounts to normal management encounters in the workplace—corresponds with DE Mentor's December 2009 probation and the resulting heightened level of scrutiny on its operations.  (Ex. E, p. 161, APP0090; Ex. B, APP0006; Ex. H, pp. 14-19, 35-38, APP0285-0290, 0303-0306.)

### D.    Hanzer and a House Manager Complain About Each Other in January 2010.

In January 2010, Hanzer was asked to attend a meeting with McGee and Beil to discuss a complaint about Hanzer that they received from House Manager Michelle Davis.  (Ex. E, pp. 223-24, APP0105-0106; Ex. I, pp. 83-86, APP0342-0345.)  Davis complained that Hanzer was overstepping her boundaries.  (*Id.*)  To that end, McGee reminded Hanzer that the House Managers do not report to her and asked her to focus on her own responsibilities.  (Ex. E, pp. 223-24, APP0105-0106.)

Following the meeting, Hanzer sent a 1600+ word letter to McGee to complain about Davis and the facility she managed.  (Ex. C, APP0008-0011.)  Although the letter makes *no mention* of discrimination, harassment, national origin, race, color, or alleged discrepancies in the November PSRs, Hanzer identifies it as her only basis to support her claim for retaliation. (Ex. E, p. 281, APP0128; Am. Compl., D.I. 40, ¶ 49.)

On January 25, 2010, Hanzer called Mentor Director Valery Bailey to complain that she was being subjected to "unfair mistreatment" and proceeded to recount various work issues she felt she was having with McGee.[13]  (Ex. E, pp. 278-79, APP0125-0126; Ex. L, ¶ 1, APP0437; Am. Compl., D.I. 40, ¶ 49.)  Hanzer admits that she did not mention any alleged PSR

---

[12] It was not uncommon to complete tasks outside of their job duties and not stay within the rigid confines of what was listed on a job description to serve their mentally disabled clientele.  (Ex. I, pp. 13-14, APP0320-0321.)

[13] Bailey is African American and English speaking.

discrepancies during this conversation, nor did she tell Bailey that she was being mistreated because of her race, ethnicity, or skin color.  (Ex. E, p. 279, APP0126.)  In response to her complaint regarding these work issues with McGee, Bailey told Hanzer that the changes she was referencing were a result of State probation (some which were required by the State), and asked Hanzer to keep working.  (Ex. E, p. 282, APP0129; Am. Compl., D.I. 40, ¶ 50.)

Hanzer characterizes other innocuous conduct as discrimination or harassment.  For example, Hanzer believes that the way McGee was "speaking to her" was discriminatory, although she offers little explanation as to why she holds this belief.  (Ex. E, pp. 263-64, APP0113-0114.)  She also thinks McGee's *facial expressions* were discriminatory but, again, offers no explanation as to why.  (*Id*.)  Additionally, Hanzer believes it was discriminatory that Beil had an office and she did not, but admits she was offered at least two offices, most recently in Millsboro with Beil and McGee.  (Ex. E, pp. 241-245, 268-69, 542-43, APP0108-0112, 0117-0118, 0176-0177.)  Hanzer holds a general belief that McGee would have had a greater respect for her if she was not Latina but offers no evidence to support her belief and no explanation for how or why she formed this belief after four years of McGee working with her and promoting her.  (Ex. E, pp. 274-76, APP0122-0124.)

Hanzer further claims she was discriminated against when she was told during a meeting about a requirement for all employees to be on-call during weekends to respond to emergencies for their disabled clientele.[14]  (Ex. E, pp. 290-92, APP0132-0134.)  She believes she should have been told in private about the on-call requirement, and was not because she is Hispanic.  (Ex. E, pp. 290-92, APP0132-0134.)  Not surprisingly, there is no evidence that non-Hispanics employees were only spoken to about schedule changes in private.

---

[14] Both Beil and McGee were also required to be on-call as a result of the probation.  (Pl. Dep., pp. 283-84, APP0130-0131)

Additionally, Hanzer believes that when Donaway asked her questions about whether she was doing her site visits (in connection with her job in Quality Assurance), this was harassment because Hanzer had already provided McGee with this information and should have told Donaway as such.  (Ex. E, pp. 306-13, APP0135-0142.)  Hanzer further believes it was harassment for Donaway to request ELPs with more detail because Hanzer was told by McGee, pre-probation, that the ELPs did not need as much detail.  (Ex. E, pp. 321-22, 598-600, APP0145-0146, 0183-0185.)  To that end, Hanzer believes they were intentionally trying to confuse her because she was Latina.  (Ex. E, pp. 321-22, APP0145-0146.)  Likewise, Hanzer believes she was subjected to a hostile work environment because she was given additional work and experienced changes in her work environment and to her job description.[15]  (Ex. E, pp. 321-26, APP0145-0150.)

### E.     Hanzer's Position is Eliminated in March 2010 by Bailey.

After a series of incidents, which culminated in Hanzer becoming visibly upset at the Millwood House in front of clients and a Quality Assurance employee, DE Mentor decided to eliminate Hanzer's position and terminate her employment.  (Ex. E, pp. 357-64, APP0151-0158.)  Bailey made the ultimate decision to terminate Hanzer's employment.[16]  (Ex. F, p. 80, APP0224.)

---

[15] According to Hanzer, one of the first changes DE Mentor implemented as a result of probation was to clarify the job duties for positions.  (Ex. E, pp. 91-92, APP0042-0043.)  Hanzer agrees that this was a good idea.  (Ex. E, p. 92, APP0043.)  Accordingly, in January 2010, Hanzer's job description changed because the State wanted clearer job descriptions.  (Ex. E, pp. 89-90, APP0040-0041.)  And yet, inexplicably, Hanzer claims that it was hostile for DE Mentor to change her job description.  (Ex. E, pp. 323-24, APP0147-0148.)

[16] McGee admits that she made a recommendation to Bailey to terminate Hanzer's employment based on certain performance deficiencies during the probationary period: Hanzer was not completing the ELPs—her main job duty—on time or in an understandable format; she required a lot of oversight and her documentation had to be corrected multiple times prior to being distributed during a meeting; she had two outbursts in front of clients; and she refused to move into an office in Millsboro.  (Ex. G, pp. 92-94, APP0268-0270.)  However, the ultimate approval and decision to terminate was made by Bailey.  (Ex. F, p. 80, APP0224.)

On March 4, 2010, Bailey met with Hanzer to discuss her outburst at the Millwood House. Bailey explained that the QA Director, reported that Hanzer was yelling and crying.[17] (Ex. E, pp. 364-65, APP0158-0159; Ex. I, pp. 92-93, APP0349-0350.) Bailey informed Hanzer that she could be terminated for that erratic conduct. (Ex. E, p. 369, APP0160.) They also discussed Hanzer's unauthorized purchase of office supplies and whether she was permitted to work from home. (*Id.*) Finally, they discussed Hanzer's driving record (she failed to report six points which had accumulated on her license) and DE Mentor's requirement to maintain a clean record. (Ex. E, pp. 369-73, APP0160-0164.) Bailey left the room, made a phone call, and returned to tell Hanzer that she was being laid off. (Ex. E, pp. 373-74, APP0164-0165.) Hanzer later received a letter in the mail stating that her position had been eliminated.[18] (Ex. D, APP0012-0016.) At no time was Hanzer's race, color, or national origin considered. (Ex. L, ¶ 5, APP0438.) Likewise, the alleged November 2009 PSR discrepancies and her alleged refusal to fix them with her own money were not discussed and did not factor in her termination.[19] (*Id.*)

In fact, the Case Manager position was eliminated and replaced by a higher level position, Program Support Coordinator ("PSC"), upon Hanzer's termination. (Ex. E, p. 376, APP0166; Ex. G, pp. 88-91, APP0264-0267; Ex. F, pp. 20-21, APP0196-0197; Ex. I, pp. 57-59, APP0335-0337.) This change brought DE Mentor in line with the rest of the company, was one of the specific objectives that Bailey discussed with the State of Delaware during negotiations to get DE Mentor off of probation, and was already being considered at the time of Hanzer's termination. (Ex. F, pp. 20-24, APP0196-0200; Ex. L, ¶ 4, APP0437.) The first PSC position

---

[17] Hanzer admits that she was crying a lot, but denies yelling. (Ex. E, pp. 363-65, APP0157-0159.)

[18] Bailey worked with Human Resources to prepare the letter to Hanzer stating her position had been eliminated; however, her preference would have been to state that Hanzer was being terminated for her performance. (Ex. F, pp. 36-37, 80, APP0204-205, 0224.)

[19] Partially due to Hanzer's misappropriation of company and client documents around the time of her termination (which was discovered during the current litigation), Mentor's probationary status was extended, and all the ELPs and client documents that she took and failed to return had to be recreated at a considerable expense of resources. (Ex. I, pp. 102-04, APP0356-0358; Ex. F, pp. 77-78, APP0221-0222.)

was filled by Lisa Wolfgang who had a college degree. (Ex. I, pp. 59-61, APP0337-0339; Ex. M, ¶ 5, APP0441.) When the position opened up again, Beil lobbied Bailey to place a non-degreed candidate in the position based on her work experience. (Ex. F, pp. 24-27, APP0200-0203; Ex. I, pp. 87-89, APP0346-0348.) Following the termination of that individual, all subsequent PSCs have held college degrees. (Ex. I, p. 111, APP0364; Ex. M, ¶ 6, APP0441.) Indeed, there are currently four PSCs, all of whom have degrees. (*Id*.)

## IV.    LEGAL ARGUMENT

### A.    Standard Of Review

DE Mentor is entitled to summary judgment if it "shows there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) mandates judgment against the party who "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jacques-Scott v. Sears Holding Corp.*, 2013 U.S. Dist. LEXIS 83157, at \*16 (D. Del., June 13, 2013) (quoting *Celotex Corp. v. Catreet*, 477 U.S. 317, 322-23 (1986)). When a party fails to make such a showing, "there can be no 'genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. (quoting *Celotex Corp.*, 477 U.S. at 323). Therefore, the moving party is entitled to judgment as a matter of law because "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*. A dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Under these standards, DE Mentor is entitled to summary judgment as to Hanzer's Title VII claims because: (1) Hanzer has not met her burden of establishing a *prima facie* case of

discrimination and no reasonable fact-finder could determine DE Mentor's reason for

terminating Hanzer was pretextual; (2) Hanzer has not set forth any evidence to suggest she was

subjected to discrimination which was either severe or pervasive, as necessary for a hostile work

environment claim; and (3) Hanzer did not engage in any act protected by Title VII and thus her

retaliation claim fails as a matter of law.  Moreover, DE Mentor is not liable under the Delaware

Whistleblowers' Protection Act ("WPA") because she has not identified a violation of law, much

less a refusal to commit a violation; even if she could, she cannot show it was the primary basis

for her termination.

### B.    DE Mentor Did Not Discriminate Against Hanzer.

Since Hanzer has no direct evidence of discrimination, her discrimination claims are

analyzed under the analysis established by the Supreme Court in *McDonnell Douglas v. Green*.

411 U.S. 792 (1973).  Under this analysis, Hanzer first bears the burden of establishing a *prima*

*facie* case of unlawful discrimination based on her national origin, race, or color.  *Keller v. Orix*

*Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997); *Fuentes v. Perksie*, 32 F.3d 759, 763

(3d Cir. 1994).  If Hanzer successfully establishes a *prima facie* case, the burden of production

shifts to DE Mentor to articulate a legitimate, non-discriminatory reason for its actions.  *Keller*,

130 F.3d at 1108; *Fuentes*, 32 F.3d at 763.  DE Mentor's burden at this stage is relatively light

and is satisfied if it articulates any legitimate reason for its conduct.  *Fuentes,* 32 F.3d at 763.

Once DE Mentor articulates a legitimate reason, the burden returns to Hanzer to persuade the

fact-finder by a preponderance of the evidence that DE Mentor's proffered reason is not the true

reason for its actions, but rather is merely pretext for discrimination.  *Keller*, 130 F.3d at 1108;

*Fuentes*, 32 F.3d at 763.

1.    **Hanzer Fails to Prove a *Prima Facie* Case of Discrimination Because Her Termination Was Not Under Circumstances Which Give Rise to an Inference of Unlawful Discrimination.**

Hanzer's discrimination claims fail at the outset because Hanzer cannot establish a *prima facie* case of discrimination. To establish a *prima facie* case of discrimination under Title VII, Hanzer must show: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; (4) under circumstances which give rise to an inference of unlawful discrimination. *Jones v. Sch. Dist. of Phila.*, 98 F.3d 403, 410-11 (3d Cir. 1999). For purposes of this Motion *only*, DE Mentor will assume that Hanzer can establish the first three prongs of her *prima facie* case.[20] Hanzer's claims nevertheless fail because she cannot establish that her termination occurred under circumstances giving rise to an inference of unlawful discrimination.

Hanzer fails to proffer any evidence to support her claims for race, national origin, and color discrimination aside from her own unsupported allegations and general beliefs. This is plainly insufficient to support a claim for summary judgment. *See e.g., Jones*, 198 F.3d at 414 (deeming unsupported allegations of discrimination based solely on plaintiff's personal beliefs to be irrelevant); *Solomon v. Soc'y Of Auto. Engineers*, 41 Fed. Appx. 585, 586 (3d Cir. 2002).

Moreover, Hanzer's  allegations of discrimination, even if true, are insufficient to form an inference of discrimination. *See* Section III.D. Hanzer believes that McGee would have respected her more if she was not Latina, but offers no evidence or explanation to support this belief, and is inexplicably blind to the glaring connection between (1) DE Mentor being placed on probation and (2) changes that were made to her employment. (Ex. E, p. 274, APP0122.)

---

[20] DE Mentor will argue at trial that Hanzer was not qualified for her position at the time of her termination when the company was on probation due to her performance.  However, since she held the position for several years, and since this Motion is limited in length, DE Mentor will not argue the point in this motion.

Hanzer also fails to explain why McGee suddenly began "disrespecting" her for being Latina four years after McGee promoted her.  (Ex. E, pp. 58-59, 266-67, APP0027-0028, 0115-0116.)  Indeed, McGee's support for Hanzer, which continued until the very end, vastly undercuts Hanzer's argument that McGee harbored a bias against her for being Hispanic.  (Ex. F, pp. 36-37, APP0204-0205.)  *See Sullivan v. Nationwide Life Ins. Co. of Am.,* 720 F. Supp. 2d. 483 (D. Del. 2010) (finding that a manager's prior positive reviews of performance cuts against the argument that unlawful factor motivated later negative assessment); *Subh v. Wal-Mart Stores*, E., LP, 2009 U.S. Dist. LEXIS 26810 (D. Del., Mar. 31, 2009) (plaintiff failed to meet *prima facie* burden where managers accused of discrimination hired him, trained him, gave him positive performance reviews and salary increases).

The situations which Hanzer describes as discriminatory bear no relation whatsoever to her race, color, or national origin.  *See Jacques-Scott*, 2013 U.S. Dist. LEXIS 83157, at * 26 (finding that plaintiff cannot establish the fourth prong in her *prima facie* case where plaintiff's allegations of discrimination are unrelated to her protected characteristics).  Rather, the changes to her job that Hanzer identifies as discriminatory—for example, being told about an on-call requirement during a meeting, being asked to include more detail in her ELPs, given additional work, having her job description changed, etcetera—all came after DE Mentor was placed on probation and all are attributable to its efforts to get off probation.  It was hardly "business as usual" during the probationary timeframe.

In fact, the only allegation made by Hanzer that could conceivably relate to her race or national origin is her allegation that her co-worker Beil laughed at Hanzer's pronunciation of "sheet."  (Ex. E, pp. 178-84, APP0098-0104.)  Even if such conduct could be considered racially motivated, an isolated comment by a co-worker falls far short of being enough to support a claim

of discrimination.  *See Jacques-Scott*, 2013 U.S. Dist. LEXIS 83157, at * 30 ("Isolated incidents

of purported discrimination do not meet the requirements under Title VII. . . . Title VII is not a

'general civility code,' and 'does not mandate a happy workplace.'") (citations omitted).  For all

these reasons, Plaintiff cannot demonstrate any inference of discrimination and cannot meet her

*prima facie* burden.

> **2.     Hanzer was Terminated for the Non-Discriminatory Reason that Her
> Performance Was Lacking and DE Mentor Wanted to Eliminate the
> Case Manager Position and Replace It With a Program Support
> Coordinator Position.**

Hanzer was terminated in March 2010 because DE Mentor wanted to replace the Case

Manager position with a higher-level PSC position as part of the process to get off probation—a

position which she was ultimately not qualified for based on her performance, experience, and

education.  With respect to her termination in March 2010, Bailey testified that she would have

preferred to terminate Hanzer months prior based on her deficient work but McGee, who was

supportive of Hanzer, wanted to continue to give her chances to improve.  (Ex. F, pp. 36-37,

APP0204-0205.)  To that end, McGee and Donaway tried to work with Hanzer to bring the ELPs

into compliance—a task which was not unreasonable and was necessary due to their

probationary status. (Ex. H, pp. 47-52, APP0309-0314; Ex. N, ¶ 3, APP0458.)  After all, Hanzer

had been responsible for creating and maintaining the ELPs for some time.  *See* Section II.A.

Hanzer, however, showed only minimal improvement at a critical time when DE Mentor needed

to substantially improve or risk closure.  (Ex. H, pp. 47-52, APP0309-0314.)

After two particularly unprofessional outbursts by Hanzer (one at the Millsboro office

and the other at the Millwood facility), McGee's support for Hanzer waned and she contacted

Bailey to discuss next steps.  (Ex. G, pp. 90-95, APP0266-0271.)  At the same time, Bailey was

working with the State to get the organization off probation and, as part of this process, was

planning the upgrade of the Case Manager position to a PSC position with a bachelor degree requirement.  (Ex. G, pp. 20-21, APP0233-0234; Ex. L, ¶ 4, APP0437-0438; Ex. F, pp. 20-24, APP0196-0200.)  McGee was not involved in that process and did not learn that Hanzer's position was eliminated and replaced with the higher-level position until the day she was terminated. (Ex. G, pp. 85-86, APP0261-0262.)  Rather, Bailey—who Hanzer does not accuse of discrimination—made the decision to terminate Hanzer's employment and upgrade the Case Manager position to mirror Mentor's operations in other states at the same time to satisfy her commitment to the State (which was made prior to McGee's call).[21]  (Ex. F, pp. 20-24, 54-55, 79-80, APP0196-0200, 0219-0220, 0223-0224; Ex L, ¶ 4, APP0437-0438.)   It is undisputed that out of the five individuals who have held the Program Support Coordinator position since Hanzer's termination all but one have college degrees.  (Ex. I, p. 111, APP0364.)  The one who did not (who was terminated), was given the position based on extensive years of experience, and against Bailey's directive.  (Ex. F, pp. 24-27, APP0200-0203; Ex. I, pp. 87-89, APP0346-0348.)

### 3.   Hanzer Cannot Discredit DE Mentor's Non-Discriminatory Reasons for Terminating Her Employment Or Produce Evidence to Show Her Termination was Discriminatory.

To discredit DE Mentor's articulated legitimate reason for terminating Hanzer, she must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [DE Mentor's] proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Keller*, 130 F.3d at 1108-09 (quoting *Fuentes*, 32 F.3d at 765). In other words, Hanzer must show "not merely that [DE Mentor's] proffered reason

---

[21] The termination letter that was sent to Hanzer stated that her position was eliminated. Both Bailey and McGee testified that they would have noted that she was also being fired for performance. (Ex. F, pp. 16, 19-20, 79-80, APP0194-0196, 0223-0224; Ex. G, p. 98, APP0272.)  Regardless, it is undisputed that at the same time that Hanzer was having significant performance and conduct issues, the Case Manager position was eliminated and replaced with the PSC position that, to this day, requires a college degree.  *See* Section II.E.

is wrong, but that it was so plainly wrong that it cannot have been the [] real reason." *Id*. at 1109.  The Third Circuit has stated that "[w]hile this standard places a difficult burden on the plaintiff, '[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr, & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Hanzer produces no evidence which could demonstrate a discriminatory motive by DE Mentor.  First, Hanzer's allegations must be viewed in the context of DE Mentor being placed on probation by the State, which meant that its operations could have been shut down.  As a result, new procedures were put in place, dedicated quality assurance was brought in, and everyone's work was subjected to a heightened level of scrutiny.  (Ex. E, pp. 169-70, APP0096-0097.) Because the ELPs were in such terrible shape, those were a priority for the team.  (Ex. F, pp. 41-42, APP0209-0210; Ex. H, pp. 35-38, APP0303-0306.)  To that end, DE Mentor asked Hanzer to change how she was doing things—not because of her color, race, or national origin—but because DE Mentor was trying to get off  probation.  Instead of rising to the occasion, Hanzer was upset that QA was identifying areas for improvement on her ELPs, she took serious offense to being told during a meeting about an on-call requirement, and she threw a fit when McGee requested that she move her office to the Millsboro location where they could work together to implement and perfect their new processes. (Ex. E, pp. 290-92, 306-13, 321-22, APP0132-0142, 0145-0146; Ex. G, pp. 92-94, APP0268-0270.)   While everyone during the probationary period took on extra work and duties to work towards getting off probation, Hanzer resisted any increase in responsibility and struggled to get her work done.  (Ex. M, ¶ 4, APP0440.)  As to her termination, she does not accuse Bailey, the sole decision-maker, of any discriminatory acts.

Rather, Hanzer's animosity is directed toward McGee, who did not make the termination decision, who had supported her for years in her position prior to State probation, and who was unaware of the job elimination and upgraded position until the day of her termination.

Furthermore, Plaintiff does not convincingly identify any non-Hispanic individuals that she believes were treated better. *See Subh*, 2009 U.S. Dist. LEXIS 26810, at * 45 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258-59 (1981)) (noting that it is plaintiff's burden to identify comparators). Hanzer only identifies Beil (Caucasian) as being treated more favorably; however, Hanzer's allegations of Beil's preferential treatment, even if they were true, are inconsequential at best and not at all evocative of any discriminatory animus on McGee's part. (Ex. E, pp. 266-72, APP0115-0121.) Indeed, Hanzer believes that Beil was treated more favorably because she had an office and because McGee would speak with her there. (*Id.*) It is undisputed, however, that Hanzer was offered an office in Millsboro with Beil and McGee. (Ex. E, pp. 542-43, APP0176-0177.) Furthermore, her claim that she was treated differently because of her race when she was not spoken to in an office is based solely on her own subjective belief that this was because of her race, which is insufficient. *See Sullivan,* 720 F. Supp. 2d at 510 Even if Hanzer was spoken to about work out in the open, this is hardly sufficient evidence of discrimination—discriminatory intent does not underlie every trivial difference in the workplace.

### C.   Hanzer Cannot Establish Any Discrimination, Much Less Severe or Pervasive Discrimination as Required for Her Hostile Work Environment Claim.

In order to survive summary judgment on her hostile work environment claim, Hanzer must establish five elements: 1) she suffered intentional discrimination because of her race, national origin, or color; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected her; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and 5) the existence of vicarious liability. *Peace-Wickham v. Walls*, 2009

U.S. Dist. LEXIS 109215, at *17-18 (D. Del. Nov. 23, 2009).  As to the severe or pervasive element, courts consider the totality of the circumstances, including such factors as frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *Id.*, at *18 (citations omitted).  Hanzer must establish that her color, race, or national origin played a substantial role in the harassment and that she would have been treated more favorably if she were white.  *Id.* (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990)).  Hanzer's subjective beliefs, without more, are not enough to survive summary judgment.  *Id.* at *18-19 (citations omitted).

Hanzer offers zero evidence of severe or pervasive discrimination.  At most, she can point to one instance of a co-worker mocking her accent—hardly severe, not pervasive.  *See Jacques-Scott*, 2013 U.S. Dist. LEXIS 83157, at *29-30 (two comments by co-workers not enough to defeat summary judgment); *Subh*, 2000 U.S. Dist. LEXIS, 26810, at *53-54; *McLean v. Communications Constr. Group*, 535 F. Supp. 2d 485, 490 (D. Del. 2008).  The other acts that she claims to be hostile—being assigned additional work and subjected to changes in her work environment—are better characterized as "a normal work day" absent further evidence.  (Ex. E, pp. 321-26, APP0145-0150.)

Even if the acts that Hanzer identifies as discriminatory could be considered either severe or pervasive, she still cannot point to any evidence that would plausibly suggest those acts were taken based on her race, color, or national origin.  *See Jacques-Scott*, 2013 U.S. Dist. LEXIS 83157, *36-38 (summary judgment for defendant where the alleged hostile conduct was unrelated to plaintiff's protected characteristics).   Her subjective believe that the alleged mistreatment was motivated by her status as a Latina is simply not enough.  *See id.*; *Sullivan*, 720

F. Supp. 2d at 511.  As such, Hanzer's claim for hostile work environment fails as a matter of law.

### D.    Hanzer's Retaliation Claim Fails Because She Did Not Engage In Any Activity Protected by Title VII.

To establish her claim for retaliation, Hanzer must demonstrate that:  (1) she engaged in activity protected by Title VII; (2) she suffered an adverse employment action after or contemporaneous with the protected conduct; (3) there was a causal connection between her participation in the protected act and the adverse action.  *Verma v. Univ. of Pa.*, 2013 U.S. App. LEXIS 16342, at *10 (3d Cir. Aug. 7, 2013) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)).  As to the third prong, Hanzer "must establish that [] her protected activity was a but-for cause of the alleged adverse action by the employer."  *Id*. (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

Hanzer's claim for retaliation fails because she did not engage in a protected activity. The only basis for Hanzer's retaliation claim is the January 21st letter which contains no reference to discrimination nor could any such reference be inferred.  (Ex. E, p. 281, APP0128; Ex. C, APP0008-0011.)  Hanzer claims that it was unnecessary to mention her race, ethnicity, or skin color in the letter because McGee "knew who she was".  (Ex. E, pp. 280-81, APP0127-0128.)  This excuse is absurd; no reasonable person could construe this work-related complaint to be a complaint of discrimination.  The complaint is not even about McGee, her alleged harasser.

Hanzer has not offered any evidence that she ever complained about discrimination or harassment prior to her termination.[22]  Thus, Hanzer's retaliation claim should be dismissed as a matter of law.  *See Cuffee v. Dover Wipes Co.*, 344 F. Supp. 2d 565, 575 (D. Del. 2004)

---

[22] To the extent Hanzer attempts to claim, now, that her call to Bailey was "protected" activity it likewise fails as she admits she did not mention discrimination to Bailey on their call.  (Ex. E, p. 279, APP0126.)

(complaints about unfair treatment "absent any express complaint about discriminatory activity" cannot be considered a protected activity).

### E.   DE Mentor Did Not Violate the Whistleblowers' Protection Act.

Hanzer's whistleblower claims fail because she fails to identify any violation of law that she was allegedly asked to commit and, even if she had, she fails to show her refusal was the primary basis for her termination.

#### 1.   Plaintiff's WPA Claim Fails Because She Does Not Identify a Law That Was Violated and Does Not Allege That She Was Asked To Commit Any Violation.

The Whistleblowers' Protection Act ("WPA"), at title 19, section 1703 of the Delaware Code, provides in relevant part:

> Any employer shall not discharge . . . an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment: . . .
>
> (3) Because an employee refuses to commit or assist in the commission of a violation, as defined in this Chapter; or
>
> (4) Because the employee reports verbally or in writing to the employer or to the employees' supervisor a violation . . . .

A "violation" for purposes of the statute consists of an act or omission by the employer that is "materially inconsistent with, and a serious deviation from, standards implemented pursuant to a law, rule, or regulation promulgated under the laws of this State, . . ." 19 Del. C. § 1702(6). Hanzer does not identify any law, rule, or regulation that was allegedly violated. However, even if she had, her claim fails because Hanzer was not asked to commit or assist in the commission of a violation.

There is some confusion regarding what Hanzer believes happened with the PSR books at Falcon Crest. The State documents indicate that one PSR was reported and investigated in November 2009 over missing receipts. (Ex. A, APP0001-0005.) That investigation led to the

correction of that book (with the State's knowledge and approval) and the termination of the House Manager involved. (*Id.*; Ex. E, p. 157, APP0087; Ex. G, pp. 44-45, APP0250-0251.) The documents also indicate that a second investigation was performed in March 2010—reported and investigated *after* Hanzer's termination—regarding three PSRs at Falcon Crest and outstanding pharmacy bills, despite documented money orders for payment on the PSRs in the late 2009 timeframe. (Ex. K, APP0409-0435.) Documents also show that those discrepancies in the PSRs were fixed and the matter closed by the state. (*Id.*) The March 2010 investigation into the PharMerica bills was unrelated and was unknown at the time of the November 2009 investigation.

Hanzer claims that there were three discrepancies regarding missing receipts in PSRs discovered in November 2009, and that although all were fixed and the House Manager terminated, only one was reported to the state. (Ex. E, pp. 42-43, 115-16, 141-42, 156, APP0025-0026, 0048-0049, 0072-0073, 0086.) To be clear, however, Hanzer's allegations do not revolve around whether the two additional PSR discrepancies were reported—she did not complain about that to either DE Mentor or the State, and has never alleged that she was asked to commit or assist in the commission of a violation related to the *reporting* of the PSR discrepancies.[23] Likewise, although Hanzer takes issue with DE Mentor's *process* in correcting the PSRs—specifically, the directive to replace the missing items—she did not complain about that to either DE Mentor or the State. Furthermore, she does not claim that replacing the missing funds of DE Mentor clients is illegal. In fact, it is required. (Ex. G, p. 34, APP0242.)

Rather, what Hanzer alleges to have complained about—and what appears to be the basis of her claim—is that she was asked, and refused, to replace any missing monies <u>with her own</u>

---

[23] This is significant, since if she actually believed there was a reportable violation is was her <u>obligation</u> to report it, and she admits she never did. (Ex. I, pp. 105-06, APP0359-0360.)

<u>personal funds</u> and then refused to sign the corrected PSRs once DE Mentor fixed the mistakes using funds other than Hanzer's.  (Ex. E, pp. 120-21, 133-42, APP0053-0054, 0064-0074; D.I. 40 ¶¶ 18-19, 23-25.)  Taking those allegations as true for the purposes of this Motion, such a refusal does not rise to the necessary legal standard.  First, Hanzer can point to no law that would be violated if she, or any employee, were to replace missing client funds with their own monies.  While it is not DE Mentor protocol, there is no evidence that such a request is illegal.  Second, signing *corrected* PSRs is not a violation of the law and therefore any such request that she sign corrected PSRs is not a violation under the WPA regardless of where the money came from.  Indeed, Hanzer never claims the PSRs were incorrect after the money and items were replaced, she only indicates that she did not want to sign them.

As there is nothing illegal about fixing a PSR found to have a discrepancy and documenting that correction, Hanzer's signing of the PSR or alleged refusal to do so cannot be the basis of a valid WPA claim.  Likewise, in the unlikely event that there was a request made to Hanzer to use her own funds to replace a client's funds, she can point to no law which was violated in making that request.

### 2.  Plaintiff's WPA Retaliation Claim Fails Because She Cannot Show That It Was The Primary Basis for Her Termination.

Likewise, there can be no retaliation related to Hanzer's alleged whistleblowing.  Under the WPA, the burden of proof ultimately rests with Hanzer to demonstrate "that the primary basis for the discharge, threats, or discrimination alleged to be in violation of this chapter was that the employee undertook an act protected pursuant to § 1703 of this title."  19 Del. C. § 1708.  *See Jordan v Town of Milton*, 2013 U.S. Dist. LEXIS 739 (D. Del. Jan. 3, 2013).

Hanzer cannot meet her burden to show that the primary basis for her termination was her involvement with the November PSRs because she actually claims her retaliation claim is based

on the January 21st letter (regarding Michelle Davis) which makes no mention of PSRs.  (Ex. E, p. 281, APP0128; Ex. C, APP0008-0011; Ex. I, p. 83, APP0342.)  Moreover, if her allegations of retaliation are somehow related to the November 2009 PSRs, as described above, she did not complain of any violation of law.  Lastly, Bailey made the decision to eliminate the Case Manager position and terminate Hanzer because of her poor performance, unprofessional outbursts and as a part of discussions with the state to get off probation.  Bailey was not involved at all with the identification, investigation, or resolution of the discrepancies with the Falcon Crest PSRs or any other alleged violations of law.[24]  (Ex. L., ¶ 6, APP0438.)

Finally, the mere fact that she asserts a claim for retaliation in violation of Title VII undercuts her WPA retaliation claim, as it makes clear that she does not believe that the ***primary basis*** for her termination was refusing to participate in a violation, whatever that violation was.  Since Hanzer offers nothing more that her own unsubstantiated allegations, summary judgment should be granted as to her whistleblower claims.  *See e.g.*, *Jones*, 198 F.3d at 414 (unsupported allegations based solely on plaintiff's personal beliefs are irrelevant).

## V.    CONCLUSION

The record of evidence demonstrates that Hanzer failed to meet her burdens.  Accordingly, DE Mentor respectfully requests that this Court grant summary judgment in its favor and dismiss Hanzer's claims.

---

[24] PSR discrepancies of this sort are not altogether uncommon, so there was no reason for Bailey to be involved. (Ex. I, pp. 35-36, 105-06, APP0324-0325, 0359-0360.)

Date:  October 31,  2013
        Wilmington, DE

Respectfully submitted,

*/s/ Jami B. Nimeroff*
Jami Nimeroff (DE # 4049)
Brown Stone Nimeroff LLC
901 N. Market Street, Suite 1300
Wilmington, DE  19801
(302) 428-8142 (t)
(302) 351-2744
jnimeroff@bsnlawyers.com

and

Barbara Rittinger Rigo, Esq. (PA #76630)
(*admitted pro hac vice*)
Leigh Ann Bigley, Esq. (PA #311228)
(*admitted pro hac vice*)
Littler Mendelson, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102
267.402.3000 (t)
267.402.3131 (f)
brigo@littler.com
labigley@littler.com

Attorneys for Defendant
National Mentor Healthcare, LLC d/b/a Delaware
Mentor